Pleased to hear argument in Anderson v. Consolidation Coal. Mr. Carlin. Please the court. I represent Joyce Anderson who lost her career as a coal miner at the age of 52 based on testimony or opinions of doctors who almost nothing about the osteoporosis that led to her discharge. I believe the problem that some have had with this case including the appellee is that they had difficulty understanding that winning an arbitration under the collective bargaining agreement did not immunize them from their state law claims. Indeed, your honors, at the arbitration, the Consolidation Coal Company argued to the arbitrator in both their pre-arbitration and post-arbitration memos that the arbitrator could not consider state law claims. And in fact, when the arbitrator ruled against her, the arbitrator specifically said in his decision that this is not dispositive of her state law as articulated most recently in 14 Penn Plaza. The someone who loses an arbitration under a collective bargaining agreement may still pursue state law claims. These are those state law claims. That doesn't mean that the collective bargaining procedure has no bearing on the resolution of the state law claim, does it? I think it actually does, your looks at, and I'm not sure what you mean by no bearing because that's a fairly broad statement. It would be relevant to the state law claims that the employer followed the collective bargaining agreement. Well, I believe your honor is suggesting collateral estoppel. I'm not sure if that's where... No, I'm not. I'm not suggesting collateral estoppel. I'm suggesting that when you look at whether somebody discriminated against someone, the fact that they followed the collective bargaining agreement would be something that the district court could take into account. Yes on the discrimination in workers' comp. No on the direct threat analysis. The direct threat analysis is a whole separate concept that is not based upon discrimination or retaliation. The way I understand the direct threat as articulated both under the West Virginia Human Rights Act and also, your honor, under the Americans with Disabilities Act as a similar provision. What that provision is about is to prevent exactly what happened here. Normally what happened in this case, why was Joyce Anderson terminated from her employment? The answer is very clearly because of her osteoporosis. If an employer wants to terminate the employment of an employee based upon a condition which the lower court agreed is a disability, it can do so, excuse me, based upon a direct threat. So if the employer in this case believes that osteoporosis is a can terminate that based on direct threat. However, if they terminate based on direct threat, they must meet the standards of the direct threat legislative regulations under the Human Rights Act. And those standards clearly state that a termination based upon the notion that an employee represents a threat to herself or others must be based on medical opinions based on the most current medical knowledge. These opinions were not based, I'm sorry. We don't get to the direct threat until after the prima facie case is established, is that correct? Well, but the prima facie case is established here. Now, Judge Wynn, we're getting. But is it correct we don't get to it until it's established, the prima facie case? Yes, but it is established in this case. And I think the lower court was confused on the analysis. The prima facie case, the lower court found that she was an individual with a disability. She certainly was regarded as one by the Consolidation Coal Company. And she was terminated. And she was terminated based upon her osteoporosis disability. That's not a question. Well, where does all that leave the collective bargaining agreement? Because the whole reason for the collective bargaining agreement was to resolve return to work disputes. And the question I have is whether you simply negate the efficacy of the collective bargaining agreement all together. They agree to a procedure for situations exactly like this. They go through the procedure. They call the physicians. They have it before a court. No weight to that at all. You see, this whole process that they went through, essentially, it doesn't matter. It doesn't matter in the direct threat context, Your Honor. That is 14 Penn Plaza at pages, I believe, 262 through 264, discusses exactly what happens in these contexts. The fact that they understand when they go through the 3J provision under the collective bargaining agreement that they also have obligations under state law. Your obligations under state law aren't thrown out the window by a provision in a collective bargaining agreement. They know that going in, this is not a mom and pop coal mine. They know going in that they've got a 3J responsibility under section 3J of the collective bargaining agreement. And they also have a prevailing under 3J does not erase their obligations under state law. It may not. But the point is, I understand your position that it doesn't erase your obligations under state law. But the question still is, it would seem to me that if an employer is accused of discrimination under the American with Disabilities Act or under some other statute, it seems to me at least relevant to resolution of the state law claim that the employer went about this in good faith and followed the collective bargaining agreement or returned to work disputes. I'm just not sure how that gets, how that doesn't bear in some way, well, on the state law claims and whether this person was, whether the employer was discriminated. But your honor, there's no, there's, I guess there's two issues I want to raise in response to that. One is with regard to the workers' compensation retaliation claim. Certainly that is evidence of good faith on part of the employer. However, there's other evidence that negates good faith on part of the employer. This is a summary judgment decision, not a jury verdict that I lost. And as a summary judgment decision, there is evidence that goes both ways on whether the employer was in good faith in the way it handled the 3J proceeding. I mean, it shows if, your honor, if you're going to try and What do you think, what do you point to the most critical error that the judge made in this case? That the doctors didn't have the most current medical knowledge? What is your prime concern? My prime, well, there's two different theories. The direct threat is the one I want to focus on the most. And although I believe there's plenty of evidence on bad faith, when you get involved in these union employers... No, no, I didn't ask you all that. Just cut to the chase and give me a sentence if you can. Tell me, the biggest mistake the judge made was ignoring what? Ignoring the proper analysis. No, don't say proper analysis. What in the proper analysis? Because that the... Current medical knowledge? Current medical knowledge, absolutely, your honor. Listen, don't shout at me. Oh, I'm sorry. I'm asking you to make the case. I apologize. I really do. I'm asking you to tell me what you think. I know you think the judge didn't properly analyze on the direct threat issue. I've got that. Yes. And you apparently think that's your strongest point, although you don't give up the other. But you think that's the clearest point that you have apparently. And I'm asking, what is the strongest argument factually and legally you have on that point? I understand and I apologize for raising my point. I am a little passionate about this case. You know what? And I've got to walk it back. Let me say, we're all passionate about it. I know. I understand. We're all better off with just talking about it. I apologize. I apologize deeply and... No problem. You don't have to apologize. But just tell me, what is it? What's the one thing that he didn't consider or didn't look at or should have or didn't deal with properly? I guess I'm a little frustrated, Judge said, myself, because I'm not being sufficiently articulate. Well, you know what? I'm giving you the chance to do it. I'm trying now, but I may be retreading. You may think I'm retreading. Look, under the Human Rights Act legislative rule... I don't need all that. What, in your opinion, did he do wrong? I'll start the sentence and you finish it. The judge made the greatest mistake because he did not... What? Review the disputed facts on the testimony as to what the medicine of osteoporosis is. This legislative rule, which follows an EEOC rule, requires that we get medical opinions from doctors who know and understand the medical condition at issue. We have a situation here where the doctor, the go-to doctor for the Consolidation Coal Company, had, at that point in his career, never treated osteoporosis patients, did not know the then-current leading theory in osteoporosis. So the judge should not have given any weight to that doctor, or the judge gave too much weight to that doctor, or the judge shouldn't even evaluate. That's a question for the jury. It's a question for the jury. There are disputed facts in this case. Well, let me ask you on that theory. So whenever any doctor testifies, it's a fact whether or not he's up on the most current medical knowledge. In your opinion, is that always a fact for the jury? There could be cases where there is undisputed evidence that could lead to a summary judgment decision. But that's not the case here. But how would you do that on current medical knowledge? Wouldn't you always challenge and say the jury needs to decide if that's the most current medical knowledge? I'm not saying he's not qualified, or she's not qualified, but based on some of the responses they gave to my question, it's not as a matter of law that they know the most current medical knowledge. That seems to be the weakness. They knew almost known medical knowledge. I know I'm not asking you about these doctors. I'm asking you the hypothetical. Do you think if it focuses on the most current medical knowledge, is that the standard? Yes. Okay. Why do you think that's always a question? Or can that be decided as a matter of law? It could be, but not in this case. The facts, I mean, I laid out in detail. Perhaps it was I laid out in detail the problems that the doctors that they relied on had. That is the greatest error, legally or factually, that the court made below. There were disputed facts, and the court should have let the direct threat go to the jury. No, no, no. I'm talking about is that the disputed fact that the court ignored, that the doctors were not up on the most current medical knowledge. That is probably the most egregious fact. What do you do with the fact that you accepted the doctor, at least in the collective bargaining context? I mean, they choose these doctors, and they whittle down the list, and then you have Dr. Seffi is the one that apparently people would come to an agreement on. And as far as I understand it, both sides accepted Dr. Seffi. And then when he came up with an opinion that didn't suit what you wanted to come up with, you said, well, his opinion is incorrect. It's not sufficiently specialized. But why isn't that classic sandbag when you agree to Dr. Seffi? And then he comes in with an opinion you don't like the way he came back, and suddenly there's launched an attack upon him after the fact that he didn't know anything about this. He didn't, you know, he was completely ignorant. Did you indicate you thought he was ignorant at the time that he was found by both sides in this process to be acceptable? Your Honor, I'm assuming I can avoid the red light here and respond. You not only assume, you have to. Okay. First of all, the arbitration was done by the union, not me. The arbitration was what? I'm sorry? The arbitration was what? Done by the union, not me. I have no involvement in that arbitration. Okay. His representative accepted Dr. Seffi. But the acceptance is pursuant to a procedure. It wasn't like somebody agreed that he is a competent doctor. Two things. Let me make two or three quick points on that. One. It was certainly acceptable from a standpoint of neutrality. No, I don't. You get so many strikes and then you're left with what's left. Nobody said we think he's neutral, at least as far as I understand the procedure. I'll pursue this in your rebuttal.  Thank you, Your Honor. Mr. Rector. Thank you, Your Honor, and may it please the Court. My name is Larry Rector, and together with my co-counsel, Danielle Stritch, we represent Consolidation Coal Company. I want to first address the points that were made during the opening argument. First is the significance, if any, of the arbitration process and the arbitration award. We believe, just as the district judge found, that that is significant. It is, right? We believe that it is significant that the arbitration process ran its course in the ordinary course and ruled and found in favor of Consolidation Coal Company. Does that arise from any West Virginia high court decision, or is it because of federal law? I believe it is federal law. Why wouldn't a West Virginia high court decision control that determination? We're dealing with a state law claim. We are dealing with a state law claim. However, if, for example, federal arbitration does touch upon an issue of state law, then state law must yield with regard to that issue. Is that preemption you're giving? Yes, Your Honor. Yes. We believe that, for example, with regard to- But the court didn't rule preemption, did it? The court did not. We raised that argument. So do you defend the court's position below on the merits, or you say it's justified by preemption? We defend the judge's decision on the merits. We believe that- You start off saying preemption. Well, my point is that we believe- Let me say, my point is you got up and could have said anything you wanted to say and you started your defense of the judgment below by talking preemption. Well, with all due respect, Your Honor, my reason for raising the arbitration is because that was the first point raised during the course of the opening argument. But the relevance of it went to the significance of the doctors in there. And we're dealing with West Virginia law. West Virginia can definitely tell you what is relevant with regard to proving a claim there. I don't know if the federal government can come in and tell them what must be relevant in the claim. That's not preemption. That's a whole different ballgame. Well, and I agree, Your Honor. The point that the district judge found with regard to- You've got different parties. As the other side has indicated, you've got the union representing on that collective bargain agreement. The issue is not even what's here. We're dealing with direct threats that are established after a prima facie case has been set up in the first instance. And then the whole issue here is a summary judgment. So all we have to deal with here, contrary to what it seems like to me, I'm not saying it was a roundabout argument, but all this case is about is is there a genuine issue, a fact that would preclude the entry of discrimination or retaliation claim judgments on this case? Absolutely. I agree 100%. That is the issue. And the issue that's been put forth is you've got a situation in which you've got her doctors all being specialists, orthopedic surgeons, and then you've got the doctors of the company being generalists, one of which admits, I don't even know anything about this study that was being used to be able to evaluate her. And the question is, is that-we're not saying it goes one way or the other, but why should that be a matter of law? Why not put that to the jury in this issue of fact? I think, Your Honor, you pointed it out in response to Mr. Carlin's questions. That is an issue of defense. We typically don't respond to questions on that side of the bench. We like to give them from this side. I understand, Your Honor. I understand. That is all a matter by way of defense. We don't even get to that issue of the direct threat under the state regulation unless the plaintiff can establish a prima facie case. The district judge correctly found that there was not a prima facie case established in order to even get to that defense. There was no evidence- That's the first part of the argument, and we'll start out with that. But ultimately, we then have to decide, or at least we may want to approach it, well, what if it is? Then we deal with it. I agree. We sort of went there with that. I mean, we can start with the prima facie case if that's the direction. You started out on collective bargaining agreement because you were following his argument. Sometimes that's not the best way to start an argument. I agree, Your Honor. We believe that there was not a prima facie case established. There was no evidence of pretext. A legitimate non-discriminatory reason was presented at the district court. There was no evidence proffered by the plaintiff establishing pretext in order to make the prima facie case. If you do want to go to the next step in determining whether or not this direct threat defense should go to the jury- What was your prima facie justification for it? The prima facie justification for it was reliance upon this Article 3J process in the collective bargaining agreement. That's exactly what Judge Stamp found. He said that's a legitimate non-discriminatory reason. Then he looked to pretext. No, it's your argument that under the collective bargaining agreement, it strikes me it does seem to touch on preemption, but let's leave that aside for a second, that the claim was raised under the CBA. It had to be raised through that process. And through that process, the company just has that as the basis for its determination. That's your argument. Frankly, that is the argument. Plus, the company went beyond just Article 3J. The company took Dr. Steinman's decision, took it to another doctor in Pennsylvania, an orthopedist, and had a record review. It said, please review Steinman's determination. Do you agree? And Dr. Rapeppe agreed that that was appropriate. It should not be returned to work. So we didn't just stop. Was he an orthopedic? Sorry? He was an orthopedic? Yes, sir. He was an orthopedic. He was in Washington, Pennsylvania. He did a record review. So the company went beyond what the contract- So you say her claim ends there, on direct threat. I believe we don't even need to get to direct threat, but if we do- Well, then that would end there, wouldn't it? Yes, sir, it would. I said you think her claim on direct threat ends there? You said yes or no. I believe- She has a claim of direct threat. Is it over at the point you just finished when you followed the CBA position and she's gone or not? I believe it is. Well, then that's what I just asked you. Yes, sir. Direct threat has to be established or determined at the time the employer makes the action, not through the use of after-the-fact experts. The law is pretty clear. You evaluate an employer's decision at the time that it's made, not after the fact. But more importantly, and I want to make this point before I run out of time, I put this question to every single medical professional, even the specialists that were offered by the plaintiff, including their retained expert for litigation purposes. I said, are you prepared at trial to offer the opinion that the opinions of Dr. Steinman and Dr. Rapeppe and Sethi went outside the standard of medical care? And they said no. So while they disagree with the conclusion- In other words, are you willing to testify that they've committed malpractice? Yes, sir. I don't know many doctors that would ever answer that question in the manner that you posed it. Well, every medical negligence case- That's not the issue before this case. It's not their determination as to whether their opinion is sufficient. The determination is whether this is competent medical evidence from which you can make this decision. And even in the prima facie case here, did the district court use the wrong test here? I do not believe that he did use the wrong test. Which one did he use? Did he use the one on the Conaway? Conaway is the appropriate test. What about the- I can't even pronounce the name of the case. Is it Hassefluch? Hassefluch. That deals with discrimination? Isn't that the test that should be applied here? Hassefluch is, if I recall correctly, was a- Rodriguez versus Hassefluch? It dealt with disability discrimination. And that's the issue before us. But Conaway is the equivalent in West Virginia to the McDonnell-Douglas burden-shifting test. And Conaway has been established- But it's the general West Virginia prima facie case. It's not the one that deals specifically with the issue here, which is discrimination in the context of the case here. So why is that not the wrong test? I think under either test you would follow the same analysis, which is the plaintiff has to establish various factors to make a prima facie case. Then the burden shifts of coming forward to offer a legitimate- Your whole point is that this is pretty straightforward. And that if you assume arguendo that a prima facie case is made, you think you advance a legitimate non-discriminatory reason, both of the different doctors that you consulted, the different doctors that you- some of whom were- or at least one of whom was a specialist- that you consulted for a medical opinion. Then it's the doctors you consulted plus the collective bargaining procedure led you to make the decision that you did. And you're saying that in the burden shifts under the classic paradigm to the plaintiff to prove it was pretextual, you're saying there's no issue of tribal fact on the pretextuality of it because you consulted these opinions and that was- you made the decision on a non-discriminatory basis. You weren't out to get somebody. You weren't out to- Whether the medical evidence was the most current medical evidence in the world or whether it could have been better, that doesn't seem to me to bear on the discrimination claim necessarily. The point is that it's not discriminatory to make a decision based on competent medical evidence, both under the collective bargaining agreement and under the physicians you consulted outside of the collective bargaining agreement. That's- it's fairly straightforward. That was a good statement you just made, but I want to go back to the prima facie case, which is where we were initially. HOSAFLU is dealing with a discrimination type case and there's a method by which initially, even before you get to whether the burden is shift or it's pretextual, you must first establish the prima facie case and the question here from this court's perspective, if you're using Conaway, you're using a different type of test than what's in the HOSAFLU. And I agree totally with what Judge Wilkerson said. It's a good statement in terms of the general law, but that does not deal with the prima facie test in the first instance, which is on the HOSAFLU, not on the Conaway. Well, Your Honor, I respectfully disagree. I believe that under either Conaway or HOSAFLU, the standard is the same. It's following a McDonnell-Douglas burden-shifting paradigm, and that's what the district judge did. HOSAFLU says you first got to establish that she's qualified, that she is handicapped. Then you've got to say whether or not she's qualified and then whether she was discharged because of it. It's a whole different test than Conaway, which is the general test. Well, and that's exactly how we briefed it in the brief. Yes, but the district court didn't analyze it that way. The result, I believe, is the same. You can affirm the district court on whatever ground. On any ground supported by the record. But they've got to use the right test. You can affirm it on any other ground, but we don't do their work for them. We only review. I understand, Your Honor, but regardless of the test, both tests, whether Rodriguez or Conaway, requires that a legitimate non-discriminatory reason be proffered, which was done, and the court found so here. And then the next step is, just as Judge Wilkerson pointed out, is whether there's pretext. And there's been no evidence presented of pretext, as the district judge found. Pretext necessary for direct threats under West Virginia law. I believe you don't get to direct threats. I understand that, but it seems like we've kind of walked that direction. Because it is a defense. You don't get to the employer's defense until you first establish a crime of patient case. The question was asked whether or not this issue of the direct threat defense is a question for the jury or a question for the court. In other words, a question of law. And it was suggested that there could be circumstances where it's a question for the court, others where it's a question for the jury. I would submit that here, this is a classic example where the court can decide. Because the standard isn't the best medical evidence. It says a reasonable judgment. A reasonable judgment. Made on a non-discriminatory basis. That's exactly right. And it's abundantly clear in employment law. Discrimination law is simply, the collective bargaining agreement never required the best medical evidence. But I think even more importantly, the law of discrimination does not require that an employer make the decision on what the court believes to be the best medical evidence. The law requires that the employer make a decision based on a non-discriminatory basis. Not on the best, this kind of evidence, or what the court might see as the best medical evidence. But it does have to be non-discriminatory. And the question is, you've put forward a pretty basic, say, look, this is the way we went about it. And my problem is, I don't think that they can, I haven't seen the evidence that shows that that's some sort of fraud or pretext or whatever. I agree. In fact, I would agree with your points with regard to what the law requires. I'd go one step further. The law does not even require that the employer make the correct decision. But it has to be competent medical evidence. And that's the issue here. It's not a question of whether or not you can go with one or the other. When you're dealing with a specific injury, as this particular claimant has, and she puts forth orthopedic surgeons, and she goes with a determination of whether or not she can do this work, and then you bring in generalists who probably see all kinds of patients. They don't know anything about this. One of the men admitted, I don't even know anything about this particular report or study that's being used to determine these kinds of injuries. And that's the issue here, and I totally agree with Judge Wilkerson in terms of the general look at this. But the issue here goes deeper than that, and that is the question of competent medical evidence. You can't just bring anybody in. You can't just go out and find three doctors when someone has specialists over here on one hand, and then you bring in three doctors here who say, okay, fine, but I don't know anything about that study. And I agree. These were not generalists. These were board-certified in occupational medicine. They were board-certified in conducting independent medical examinations. They were board-certified in doing disability analysis. Dr. Bellantoni is an osteoporosis expert, I agree. She's a clinician and an academician. She has never, ever done in her life, she testified, an employability analysis. She has never rated anybody for determining whether they can go back to work. I think in this case you need both the medicine, because it is a return-to-work, fitness-for-duty question. You need the medicine, and then you need also the occupational issue. That is what Dr. Steinman and Dr. Sethi provided. The orthopedic surgeon, the family doctor, or the treating doctor, said, common sense would suggest that she should not return to work. But I'm not aware of any evidence-based data to preclude it. She, in her own opinion, did not give an unqualified, she should go back. She said, common sense would suggest she should not. That's what she said. That's the evidence you have before you. Dr. Sethi, Dr. Steinman, Dr. Repeppy, all saying she should not. And then her orthopedic surgeon who says common sense says she should. Thank you. These cases are always tough because you admire somebody that wants to go back to work. On the other hand, and it's admirable, but on the other hand, you don't want somebody to return to work and be seriously injured. And it's just a hard situation. This case is a good example of that. The mine superintendent struggled on this. This record is clear. The reasonable accommodation claim has been abandoned by the plaintiff, but the evidence of what the company did to try to find her employment, to keep her employed, goes to the issue of whether there was a pretext. The company looked at surface. The company didn't say you can't come back to work. The company said you can't go back. Are we bound by West Virginia case law and the regulations there on this case? By way of the affirmative defense, if you get that far, I believe, yes, sir, you are bound. When you get to that, as you say, get to that far, and I assume you're talking about with regard to direct threats, if you do get there, then the question does become whether the medical evaluation was competent, reasonable, and whether it was based on current and available medical evidence. I don't know that I would. I don't know that I would. The regulation says that. I'm basically reading it. Well, it also says reasonably objective. This is competent, reasonable, and based on current and accurate medical knowledge. Correct. But, Judge, you offered her other jobs, didn't you? We did. We offered her positions on the surface. She actually was not able to qualify because she did not have seniority under the CBA, and we could not give her preference under the CBA because the law on that is something else. You didn't say you can't do anything here. That's right. We offered her employment on the surface. We also offered her salaried positions that were not subject to the CBA. I want you to respond to Judge Wynn's question clearly because that seems to be where the case is focused from the other side, which is that the medical evidence you looked at was competent, and you just heard regulations. Make a complete argument to me in two or three sentences on that point. Yes, sir. I disagree that it's incompetent. One, the physician who did the IME, Dr. Wynn. It doesn't make any difference if you disagree. I mean, is it or is it not based on the record would be the first question. Yes. And not just competent. Competent, knowledgeable, and based on current and accurate medical knowledge. It's the current and accurate medical knowledge, and if you will incorporate that discussion, at least Dr. Stenman's acknowledgment that he just misread a study. He was not up on this latest study in his evaluation. Are you referring, Your Honor, to the fracks? Yes. Well, what's very interesting is— Isn't that what we're talking about? He said he didn't know a thing in the world about it. Well, Your Honor, there are two competing studies. I don't think you— No, I'm sorry. I want you to be sure and answer Judge Schitt's question. Yes. Well, and in doing that answer, Judge Wynn's amendment to it, too, because I want you to—you're going to answer all of that, all together. Yes, I agree. But here's your chance. I'll try not to interrupt you, but just do it in two or three sentences. Make your point. The reason why Stenman's IME was accurate is he ordered the DEXA scan, which is the radial bone dexometry scan, to determine bone density, which is the critical part of this case. That yielded a result of 3.94 standard deviations from the mean with regard to her condition. She had early-onset menopause. I don't need all that. You could summarize that by saying he did an examination and found her to be under— and nobody challenges that. The issue clearly should be the question about this study that a doctor said he didn't know anything about. Well, in that study, there are two studies, FRISC and FRAX. Dr. Bellantoni, who's the osteoporosis expert, agreed that there are detractors of each study. She prefers FRAX. She agrees that it's got its detractors. She also agrees that FRISC is out there as a competing study to try to determine the same thing, which is to predict future fracture risk, FRISC. Dr. Stenman used FRISC. We don't believe that that was outside the realm of medical knowledge at that time. In particular, Dr. Bellantoni bases her decision, and it's clear from her deposition. She bases her decision based upon the developments that occurred from 2009 until the date of her deposition, which was almost four years. But the question is if you know about a particular study, and I give it there's another study out there, FRISC, but you don't know about the competing one, is that sufficient to be able to say that you were up on current medical knowledge? If you don't know the competing study and you only know one study? It's not even clear that the FRISC study, which was developed in the United Kingdom and has now subsequently been adopted by the World Health Organization, it's not even clear that for the practitioner. It may not be, but at least you've got evidence from the claimant side at least that that is a relevant study. And there's nothing to say that it's not. The only thing, Dr. Stenman, he just candidly admitted, I don't understand this study. I don't know anything about the study, but I know about this one. And the issue only goes to this. Now whether or not it's okay for him to do it, but is that knowing, is that a current acknowledgment of what law is on medicine at this point in time? Well, this court, nor should the employer, be second-guessing medical professionals. Provided that medical professional produces a report. No, we wouldn't do that. That's not my question. And I understand I would not want to second-guess a medical professional even if they use one study or not. But if the law requires that he is current and accurate medical knowledge, to have knowledge of one study and know there's an equally or at least a competing study out there that everybody puts in the same category, and you have no idea about the other one, is that sufficient to satisfy a current and accurate medical knowledge requirement? Under the regulations that I think we are bound by, if we get to, as you say, the direct threat. I believe that under the facts of this case that is sufficient. I don't believe that in a case like this we have to try to seek out an expert at Johns Hopkins University who is an expert in osteoporosis, who, by the way, testified that she will not do these kinds of evaluations and would not have done this evaluation if asked. These folks are academicians who are at the heat of the debate on the disease osteoporosis. I think what you really need to do, as I suggested, is an occupational medical specialist who can determine the disease and how it impacts the job, not just the disease process. Even if you look at fracts, which is what Dr. Bellantoni relied upon, it yields a calculation that she's likely to have a repeat fracture or an additional fracture, 32.7%. That's still a very high fracture risk. That's something that all of the medical professionals in this case agree on. Dr. McKinley, Dr. Bellantoni included that because of her high T-scores, four standard deviations from the mean, she was at a very high risk of fracture. World Health Organization guidelines establish that. I see that I'm out of time. Thank you very much for the four good reasons. Mark? I have a little concern in my – whoops, am I starting? I have a little concern – Just a minute. The clerk turned the lights on. Okay, thank you. I have a little concern – Before you start, I want to make sure I wasn't confused in terms of the study. Which study is it that Dr. Sedman said he misinterpreted? Was that – Frisk. Was it Frisk or was it – Yes. What's the Henry study? The Henry study is a Frisk study. And what Dr. Steinman said in his original opinion, which was incorporated by Dr. Seddy, is that there was a 50% probability Ms. Anderson would have another fracture within two years. But when I took him over – and by the way, he found that on Google, not by a medical database. When I took him over the study – Excuse me. I don't see the limiting – any limiting principle to your position. It seems to me this is going to go down the road of second-guessing doctors ad infinitum. Because any time doctors disagree or any time you are dissatisfied with the credentials of one doctor or another, or that you can argue somebody was not sufficiently specialized or somebody was not aware of this study out there, then we come into court on it. And it just doesn't seem to me that we – that there's any logical stopping point to this. We're going to be in a swamp. And we're going to be a sort of a board of medical appeals, sitting and looking at specialists and all the rest. And meanwhile, while we're doing that, we're going to say that it didn't matter whether the collective bargaining process was faithfully followed or not. And this gets so far away from the basic premise and purpose – and it's a laudable one – of the employment discrimination laws, which are to prohibit discrimination. But I don't see in this record that this employer is a bad actor, that it's a discriminator. It doesn't seem to me we just can't pin an evil image on what happened here. It's not about evil, Your Honor. It's about – you know, look, what I was about to say. First of all, I want to say much of what my opponents said are disputed facts. I don't have time to get into those, so I'm going to cut to the chase on your point. Is that the issue? Really not a question of whether or not we're going to have to guess between professionals. Is this something we already in court? Just let the jury try the case. Let the jury try the case. It's an extreme case, Your Honor. I understand and share your concern. But, see, what you're describing to me is almost – seems more fitting to a medical malpractice suit than it does a discrimination suit. I mean, this is – the wars of competing doctors and everything, that's what you have when you have a medical malpractice. But here the question is whether the employer discriminated against her on a gender basis or a handicap basis or whatever. That's different. The direct threat is – there's no question that she was terminated from her employment because of her osteoporosis. And the law permits them to do that, but they have to do it on good medical knowledge. The evidence in the – That's infinitely open-ended. Not in this case, though, Your Honor. This is an extreme case. What I was about to say – It's not extreme at all. They had – they chose the doctors according to a perfectly logical process. And the doctor's expertise is not only a matter of orthopedics, which it is, but it's also a matter of occupational expertise. They tried to select that. They inquired a specialist outside this collective bargaining process. They offered her jobs. And we're going to say that they discriminated against her or that there was some issue of tribal fact on that point. And that pushes it pretty far. I don't think in this case it does, Your Honor. This is a union – this starts with a union company dispute. Those are not done in the kind of academic – there's a fight between union and management in this case. And there was lots of reason, which we haven't gone into. What's the question of material fact to the way this case reaches us? What's the question? There are questions about fact. But point to the question. That's what I was trying to get at earlier. What is the question of material fact that's still at dispute? The question of material fact. The other side – let me say and preface it. The other side, what you want to talk about, they think under the law we don't even get to that. We don't even get to that issue. Why are they wrong? Because the direct threat affirmative defense is a different species than the typical pretext case. The direct threat defense was developed because it was recognized that in some cases an employer will want to fire an employee because they present a threat to themselves or others. That's what happened in this case. And when we get into that paradigm, it's not the pretext paradigm. The question is not whether the employer was evil and wanted to get rid of this employee. What about the pretext paradigm, though? It was established there to a reasonable degree that she shouldn't be working there again. So how then do you get to the direct threat question? The direct threat question. Aren't those two questions sort of mutually exclusive? If under the pretext approach, what they did in this case, and they find that she is likely to get hurt again, then why is there anything left on the table? Well, first of all, she is not likely to get hurt again. I didn't say that. I said she's found to be that. And your answer would be that it wasn't necessary to find such a thing in this case? My answer would be that I guess I respectfully disagree with the way in which the court seems to be analyzing the case. That's not an answer to my question, though. You can answer it. You can say that that's a separate issue, not that you disagree with it. So does that issue touch at all on your issue, or you think it doesn't at all? I guess I'm not fully sure I understand the question. I think that when we're looking at whether or not- Let me ask you this way. You think they could, the court could find there was no pretext for her firing, but yet she could still win on a direct threat question? We don't need a pretext. She was fired- I didn't ask you that question. Yes, I think- Could it be that they could, in fact, have fired her properly under the pretext approach, but still that doesn't address your question of direct threat? That's what I'm asking you. I guess I'm having trouble answering it because my analysis is a little different. Let me say it again. I see you're out of time, and I can't ask it any more clearly. I'll look at your brief on that. Please do. Thank you, sir. Thank you. Thank you all. We'll come down and pre-counsel move directly into our next case.
judges: J. Harvie Wilkinson III, Dennis W. Shedd, James A. Wynn, Jr.